**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 21-23668-CV-WILLIAMS**

EDWIN GOMEZ,

      Plaintiff,

v.

THE CITY OF MIAMI, *et al.*,

      Defendants.

_____/

<u>**OMNIBUS ORDER**</u>

**THIS MATTER** is before the Court on various motions. On August 23, 2022, Plaintiff Edwin Gomez ("***Plaintiff***" or "***Gomez***") filed his Second Amended Complaint (DE 60) ("***SAC***").[1] Defendant the City of Miami ("***City***") filed a Motion to Dismiss the SAC (DE 65) ("***City's Motion to Dismiss***") and Defendant Javier Ortiz ("***Ortiz***" or, together with the City, "***Defendants***") filed a Motion to Dismiss the SAC (DE 66) ("***Ortiz' Motion to Dismiss***"). Plaintiff filed an Omnibus Response in Opposition to the Motions to Dismiss (DE 74), and Defendants each filed their respective replies (DE 77 (the City); DE 78 (Ortiz)).

Prior to the Court's resolution of Defendants' Motions to Dismiss, the City filed a Motion for Summary Judgment (DE 86) ("***City's Motion for Summary Judgment***") and Ortiz filed a Motion for Summary Judgment (DE 89) ("***Ortiz' Motion for Summary Judgment***"). Plaintiff filed an Omnibus Response in Opposition to the Motions for

---

[1] The Court previously granted Defendants' Motions to Dismiss Plaintiff's First Amended Complaint and allowed Plaintiff leave to amend. (DE 58.)

Summary Judgment (DE 91), and Defendants each filed their respective replies (DE 95 (Ortiz); DE 96 (the City)).

Additionally, on December 19, 2022, Defendants jointly filed a "Motion to Strike Docket Entries 91-1, 91-6, 91-8 for Discovery Violations, Noncompliance with 28 § U.S.C. [sic] 1746, and for Sham Affidavit" (DE 94) ("***Motion to Strike***"). Plaintiff filed a Response in Opposition to the Motion to Strike (DE 100), to which Defendants filed a Reply (DE 101). The Motion to Strike was referred to Magistrate Judge Sanchez, who issued an Order on August 8, 2023 granting in part and denying in part the Motion to Strike, and deferring the issue regarding Plaintiff's Declaration (DE 91-1) to the Court for consideration in conjunction with Defendants' Motions for Summary Judgment. (DE 109.)

For the reasons set forth below, the City's Motion to Dismiss (DE 65) is **GRANTED IN PART AND DENIED IN PART**; Ortiz' Motion to Dismiss (DE 66) is **GRANTED IN PART AND DENIED IN PART**; the Motion to Strike Plaintiff's Declaration (DE 94) is **DENIED**; the City's Motion for Summary Judgment (DE 86) is **GRANTED IN PART AND DENIED IN PART**; and Ortiz' Motion for Summary Judgment (DE 89) is **DENIED**.

## I.    BACKGROUND

Plaintiff Edwin Gomez, a police sergeant, and Defendant Javier Ortiz, a police captain, are officers employed by the City of Miami Police Department ("***Department***"). (DE 60 at 2.)[2] Ortiz was formerly the President of the Fraternal Order of Police Union ("***FOP***"). (*Id.* at 2, 6.) Plaintiff alleges that Ortiz engaged in "racist, illegal, and grossly

---

[2] The SAC does not contain page numbers. Therefore, SAC page numbers refer to the page numbers automatically generated by the Court's e-filing system, CM/ECF.

discriminatory behavior." (*Id.* at 2–3.) On multiple occasions, beginning as early as 2014,[3] Plaintiff and others spoke out against Ortiz and tried to get him removed as President of the FOP and from the police union. (*Id.* at 6.) Moreover, from 2019 through 2021, Ortiz was involved in ongoing investigations regarding his racist conduct towards "minorities, females and in particular African Americans." (*Id.* at 3–4.) Plaintiff often publicly spoke out about Ortiz and actively participated in investigations against him. (*Id.* at 3–5, 6–9.)

Plaintiff alleges he spoke out against Ortiz on multiple occasions, including the following: (1) on December 12, 2018, Plaintiff gave a statement to the Florida Department of Law Enforcement ("**FDLE**") regarding an investigation into Ortiz' racist behavior that was later taken over by the FBI and United States Department of Justice (*id.* at 3–4; DE 65-1); (2) on January 17, 2020, Plaintiff appeared at City of Miami Commission meeting and told the Mayor, all City Commissioners, City Manager, Police Chief and Command Staff that he objected to the "racist, illegal, and outrageous behavior" of Ortiz and others that violated the Federal Anti-Discrimination Statutes, including Title VII (DE 60 at 4–5; DE 65-2); (3) on July 29, 2020, Plaintiff wrote a memorandum to Internal Affairs ("**IA**") Major Jose Fernandez, which, among other things, reported Plaintiff's opposition to and participation in the investigation of the racist, illegal behavior of Ortiz and others, whose actions were prohibited under Title VII and other State and Federal anti-discrimination statutes (DE 60 at 5; DE 65-4); (4) on March 24, 2021, Plaintiff wrote an email to City Attorney Stephanie Panoff advising her of his desire to oppose and report improper and unlawful activities within the Department, including Ortiz' racist behavior (DE 60 at 5; DE

---

[3] Because the SAC, which is replete with conclusory, vague, and immaterial facts, lacks clarity and coherence, it is challenging to discern the facts and timelines surrounding certain events.

65-4); (5) on May 18, 2021, Plaintiff wrote an internal memo to Chief Art Acevedo stating, among other things, his objections to practices prohibited under Title VII (DE 60 at 5; DE 65-5); and (6) Plaintiff cooperated in investigations and provided evidence of racist policy violations committed in multiple emails and memorandums to Chief Jorge Colina (DE 60 at 5).

Plaintiff contends that he was retaliated against for speaking out against Ortiz. On February 11, 2019, Ortiz allegedly coordinated a "malicious" IA investigation against Plaintiff, which concluded in Plaintiff being suspended from duty for 160 hours in February 2020. (DE 60 at 5–6, 12.) Additionally, Plaintiff claims that after speaking out against Ortiz he was "denied promotions, suspend[ed] without pay, punitively transferred, and denied overtime." (*Id.* at 6, 9.)

Along with the alleged retaliation by the City and Ortiz, Plaintiff also claims that Ortiz slandered him and subjected him to intentional infliction of emotional distress. (*Id.* at 12–15.) On January 17, 2020, Ortiz attended a hearing at City Hall, and after stating "that he was not there as a captain or on behalf of the [D]epartment . . . and that he was his own man," he began to attack individuals who had previously spoken out against him, including Plaintiff. (*Id.* at 12–13.) Specifically, Ortiz stated that Plaintiff was "a documented coward that ran away from arrest." (*Id.* at 13.)

Furthermore, Plaintiff states that other officers advised him of threatening messages delivered by Ortiz that were directed at Plaintiff. (*Id.*) These messages were communicated verbally and posted online on the Telegram application under the "MDPTAC" forum, which is used by "hundreds of City of Miami Police employees to communicate work related matters." (*Id.*) Ortiz allegedly posted a message on the forum

stating: "I know who my enemies are," and "for the cancers in the PD, your day will come." (*Id.*) Furthermore, Ortiz told an unnamed police supervisor that he "would be back to work and that he was coming back with a vengeance," and the supervisor shared the message with Plaintiff "in confidence." (*Id.*) Plaintiff was also advised that he was one of a few individuals being written about on the City of Miami Police forum, Leoaffairs.com. (*Id.*) Specifically, Plaintiff's name, home address, and "other personal and confidential information" were posted by someone on the Leoaffairs.com site. (*Id.* at 13–14.) Finally, on September 11, 2020, Ortiz participated in an online chat—he advised he was "doing so in his individual capacity"—and stated that Plaintiff's wife left him for a "better man," that Plaintiff was a "documented coward," and that Plaintiff had "domestic violence issues." (*Id.* at 14–15.)

Plaintiff alleges he is not the only individual who has faced First Amendment retaliation by the City and Ortiz. Plaintiff alleges that the following individuals also faced such retaliation: (1) Sergeant Max Valdes for speaking in opposition to Ortiz' misconduct at union meetings; (2) now retired Lieutenant Leo Tapanes for speaking up in union meetings regarding Ortiz' corrupt behavior; (3) now retired Assistant Chief Anita Najiy, the first Black female Assistant Chief who is also Muslim, who was attacked publicly and harassed online by Captain Ortiz in 2018 and 2019; (4) President of the Miami Community Police Benevolent Association ("**MCPBA**"), Stanley Jean Poix, and Roman Carr, a black officer, for speaking up about the racism, corruption in the department, and "pattern of Ortiz'[] behavior"; (5) Major Dana Carr, Officer Roman Carr's wife, because of her husband's involvement in speaking up publicly against "the same practices opposed by Plaintiff Gomez in the same forums"; (6) Detective Al Matias for writing affidavits and

vocally and vehemently speaking out against corruption in the Police Department; (7) retired IA Sergeant Rolando Davis, a Black male, for investigating Ortiz' false arrest allegation; (8) retired IA Sergeant Tracy Sloan, a Black female, for investigating Ortiz on a minor disciplinary action; (9) Sergeant Travis Lindsey for speaking up in a meeting regarding corruption and Ortiz; and (10) now retired Officer Rudy Herrera who was outspoken in union meetings against Ortiz from 2020 to 2021. (*Id.* at 10–11.)

On October 18, 2021, Plaintiff filed this lawsuit. (DE 1.) On January 13, 2022, Plaintiff filed an amended complaint against Defendants. (DE 23.) Following the Court's order granting Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (DE 58), Plaintiff filed his Second Amended Complaint on August 23, 2022 (DE 60). In the SAC, Plaintiff advances four counts against Defendants: retaliation in violation of Title VII of the Civil Rights Act of 1964 against the City (Count I); violation of the First Amendment under 42 U.S.C. § 1983 against both Defendants (Count II); intentional infliction of emotional distress ("*IIED*") against Ortiz (Count III); and defamation against Ortiz (Count IV). Both Defendants moved to dismiss the SAC. (DE 65 (the City); DE 66 (Ortiz).)

## II.   LEGAL STANDARD

### A.  *Motions to Dismiss.*

To survive a Federal Rule of Civil Procedure 12(b)(6) ("*Rule 12(b)(6)*") motion to dismiss, a complaint must plead sufficient facts to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court must accept factual allegations as true and draw reasonable inferences in the plaintiff's favor. *See Speaker v. U.S. Dep't. of Health & Human Servs. Ctrs. For Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir.

2010). While a claim need not provide "detailed factual allegations," it must provide "more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*; *Iqbal*, 556 U.S. at 663 ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."). Although the court resolves all doubts or inferences in the plaintiff's favor, the plaintiff bears the burden of framing the complaint with sufficient facts to demonstrate that they are entitled to relief. *Twombly*, 550 U.S. at 556.

### B. *Motions for Summary Judgment.*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[O]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Any such dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The party seeking summary judgment carries the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case." *Feinman v. Target Corp.*, 2012 WL 6061745, at *3 (S.D. Fla. Dec. 6, 2012) (citing *Celotex*, 477 U.S. at 325).

Once the movant satisfies their burden, the burden of production shifts to the nonmoving party, which must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Courts must view the evidence and make all factual inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Evidence that is "merely colorable" or "not significantly probative" is insufficient to defeat a motion for summary judgment. *Id.* at 249–50.

## III.   DISCUSSION

The Court first discusses Defendants' Motions to Dismiss (DE 65; DE 66) and then Defendants' Motions for Summary Judgment (DE 86; DE 89).

### A.   *Defendants' Motions to Dismiss are granted in part and denied in part.*

Plaintiff asserts two claims against the City for retaliation (Count I) and violation of Plaintiff's First Amendment rights under § 1983 (Count II) and three claims against Ortiz for violation of Plaintiff's First Amendment rights under § 1983 (Count II), IIED (Count III), and defamation (Count IV). Defendants each move to dismiss all counts against them, arguing Plaintiff has not stated a claim for which relief may be granted.[4] Plaintiff filed a

---

[4] The City also argues that Counts I and II constitute an improper shotgun pleading. (DE 65 at 14.) Ortiz makes the same argument as to Count II. (DE 66 at 4–5.) The Court agrees that the SAC is not exemplary legal exposition. Notwithstanding the deficiencies, however, Plaintiff's claims give Defendants sufficient notice of the grounds upon which each claim rests, allowing them to frame a responsive pleading. *See Pouyeh v. Pub.*

consolidated Response in Opposition to both Defendants' Motions to Dismiss.[5] The Court addresses each count in the SAC in turn.

### 1.   Count I: Title VII retaliation.

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). "Once a prima facie case has been established, the [employer] may come forward with legitimate reasons for the employment action to negate the inference of retaliation." *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016) (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (citation omitted)). "If the employer is able to advance legitimate reasons for the adverse employment action, the burden shifts back to the employee to demonstrate, by a preponderance of the evidence, that the employer's reasons are pretextual." *Id.* at 1310–11. In its Motion to Dismiss, the City argues that Plaintiff has failed to adequately plead a prima facie case of discrimination, challenging only the first and third factors. (DE 65 at 6.) The Court

---

*Health Tr. of Jackson Health Sys.*, 832 F. App'x 616, 623 (11th Cir. 2020) (citation omitted).

[5] Plaintiff's Response, which predominately copies and pastes the allegations of the SAC, is "not a paradigm of cogency or persuasiveness," *cf. Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)), and fails to meaningfully respond to or refute many of Defendants' arguments. And while the Court views the allegations in the light most favorable to Plaintiff, as the Seventh Circuit observed, "Judges are not like pigs, hunting for truffles buried in briefs. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

addresses each factor in turn and concludes that Plaintiff has adequately pled a prima facie case of Title VII retaliation.

a. *Statutorily protected conduct.*

"Title VII recognizes two forms of statutorily protected conduct. An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)." *Ceus v. City of Tampa*, 803 F. App'x 235, 245 (11th Cir. 2020) (quoting 42 U.S.C. § 2000e-3(a)). "In order to establish a statutorily protected expression under the opposition clause, a plaintiff must show that he 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Id.* (quoting *Furcron*, 843 F.3d at 1311 (citation omitted)). "[A] plaintiff must allege both that he honestly believed his employer was engaged in unlawful employment practices, and that his belief was objectively reasonable." *Id.*

To establish a statutorily protected expression under the opposition clause, a plaintiff's burden "has both a subjective and an objective component." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). "In determining whether a plaintiff reasonably believed an employer engaged in an unlawful practice, a court must look to substantive law, because 'if . . . plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.'" *Small v. City of Hollywood*, 2023 WL 2302069, at *8 (S.D. Fla. Feb. 28, 2023) (quoting *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1317 (11th Cir. 2002) (quotation omitted)). Title VII protects individuals who file formal

complaints (e.g., EEOC complaints) and those who voice informal complaints. *Ceus*, 803 F. App'x at 246 (citing *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989)).

"In order to have engaged in protected activity under the participation clause, the employee must have 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under' . . . subchapter VI of Chapter 21 of Title 42 (42 U.S.C. §§ 2000e−200e-17)." *Id.* (quoting 42 U.S.C. § 2000e–3(a)). "This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *Id.* (citing *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).

Plaintiff contends that he engaged in statutorily protected activity protected by the opposition clause. He asserts that the City's retaliation was in response to his involvement in at least three years of ongoing racial discrimination investigations of Ortiz.[6] (DE 60 at 3.) Plaintiff provides numerous examples where he opposed Ortiz' "racist, illegal, and outrageous behavior," including his opposition at "public hearings and meetings with City of Miami Command Staff, as well as cooperating with the FBI and FDLE." (*Id.* at 3–5.) Plaintiff alleges specific examples of discriminatory behavior, such as Ortiz "making racist comments to citizens of color, falsely claiming to be black, profiling black citizens, using his official position as a police captain to boycott police protection for a concert by black performers, doxing [sic] racist language, and targeting black minority and female

---

[6] Plaintiff references an EEOC complaint but does not append it to the SAC and does not appear to allege that the retaliation against him was in response to this EEOC complaint.

employees for discriminatory treatment." (*Id.* at 4.) In sum, Plaintiff alleges that Ortiz' conduct violated Title VII and other State and Federal anti-discrimination statutes. (*Id.*) Therefore, Plaintiff has adequately alleged that he honestly believed the City was engaged in unlawful employment practices. And the Court finds that Plaintiff's belief was objectively reasonable because a claim under Title VII may be established by allegations "that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

The City cites *Little* to support its position that Plaintiff's opposition was not directed at an unlawful employment practice. (DE 65 at 7.) However, the facts in *Little* are readily distinguishable from those presented here. There, the plaintiff alleged he was retaliated against for objecting to a co-worker's single, isolated, racially offensive comment. *Little*, 103 F.3d at 958. The court found that because the plaintiff had not alleged that the employer knew about the racially offensive comment and failed to take prompt remedial action, the racially offensive comment could not be attributed to the employer and plaintiff's complaint about the comment did not constitute opposition to an unlawful employment practice. *Id.* at 959–60.

Here, rather than challenging an isolated racially offensive comment, Plaintiff alleges that he and other officers protested multiple acts of and comments by Ortiz and systemic racism in the Department over the course of three or more years. Given the many years that Gomez and other officers complained about Ortiz, and the City's investigations into Ortiz' conduct, Plaintiff has sufficiently alleged that the City was aware

of Ortiz' objectionable behavior. (DE 60 at 3–5.) Despite this, there is no indication in the record that the City took meaningful remedial action. Thus, when viewed in the light most favorable to Plaintiff, Plaintiff adequately pleads his opposition to the City's unlawful employment practice.

Additionally, the City cites to *Ceus* to support its position that Plaintiff failed to assert any specific discrimination he or anyone else at the Department faced. (DE 65 at 7.) However, *Ceus* is also distinguishable. There, a firefighter working at Tampa Fire Rescue ("**TFR**") alleged he was discriminated against for reporting discriminatory activity through various memos, emails, and other internal complaints; he characterized TFR as a "racist department" with "a racist issue," and complained of "the unfair treatment of 'bullying.'" *Ceus*, 803 F. App'x at 246–247. However, the court found that plaintiff's informal complaints about racism were not statutorily protected conduct because "although Ceus generally decries racism within TFR, Ceus does not tie that assertion to any specific discrimination he or anyone else employed by TFR faced." *Id.* at 246. Additionally, the court determined that plaintiff's "bullying" email was not protected because "it did not mention race or discrimination." *Id.*

Although like the plaintiff in *Ceus*, Plaintif here engages in similar generalized criticisms, he also asserts racism and discrimination that he and other "minorities, females and in particular African Americans" faced. (DE 60 at 4.) Plaintiff does not merely posit his opposition to "bullying" through informal complaints, *see Ceus*, 803 F. App'x at 235, but instead points to examples where he initiated complaints or participated in investigations addressing Ortiz' repugnant conduct. Accordingly, Plaintiff has alleged that

he had a good faith, reasonable belief that the City was engaged in unlawful employment practices.

b. *Causation*.

"To demonstrate a causal connection between a protected activity and an adverse employment action, the plaintiff must show that: (1) the decisionmakers knew of his protected activity; and (2) the protected activity and adverse action were not wholly unrelated." *Harris v. Fla. Agency for Health Care Admin.*, 611 F. App'x 949, 951 (11th Cir. 2015) (citation omitted). "In the absence of other evidence, a plaintiff may show causation by temporal proximity." *Blanc v. City of Miami Beach*, 965 F. Supp. 2d 1350, 1355 (S.D. Fla. 2012) (citing *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006)). "[M]ere temporal proximity, without more, must be very close." *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229 (11th Cir. 2011) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).

The City argues that Plaintiff has failed to plead that his protected activity caused the adverse employment actions against him. (*See* DE 65 at 8.) Indeed, Plaintiff alleges many adverse employment actions, such as suspension without pay, denial of benefits, promotions, and overtime, and punitive transfers, and he states that these adverse actions were "in blatant retaliation for his protected activities in opposing conduct in the City of Miami Police Department that was racist and violated Title VII." (DE 60 at 5–6.) However, these allegations do not establish causation because Plaintiff fails to plead that the protected activity and adverse action were in any way related. *See Glover v. Donahoe*, 626 F. App'x 926, 931 (11th Cir. 2015) (affirming dismissal of Title VII retaliation claim because plaintiff failed to demonstrate that "the supposed adverse actions [plaintiff]

suffered . . . were in any way related to [plaintiff's] protected activity"). Plaintiff's contention that "he was subjected to the adverse action in direct response to his opposition to practices that violate Title VII and that there was no other reason for the adverse action other than the prohibited retaliation," (DE 74 at 13; DE 60 at 6), are "unadorned, the-defendant-unlawfully-harmed-me accusations" that cannot support a cause of action. *See Iqbal*, 556 U.S. at 678.

Nonetheless, when viewing the allegations in the light most favorable to Plaintiff, Plaintiff has plausibly alleged causation because of temporal proximity. As argued by the City, Plaintiff does not allege the exact date of any of the alleged retaliatory acts (*see* DE 65 at 9; DE 60 at 1–6), which can be virtually "fatal to h[is] retaliation claim." *Cf. O'Hara v. Univ. of W. Fla.*, 750 F. Supp. 2d 1287, 1312 (N.D. Fla. 2010) (finding that plaintiff's failure to provide information regarding the dates of her complaints was "potentially fatal to her retaliation claim" brought under Title VII). However, the claim is salvaged, in part, because Plaintiff states his suspension without pay occurred in February 2020. (DE 60 at 6.) Before the February 2020 suspension, Plaintiff alleges that he appeared at a City of Miami Commission meeting on January 17, 2020 and "objected to the racist, illegal, and outrageous behavior of Ortiz." (*Id.* at 5.) Therefore, Plaintiff has sufficiently alleged temporal proximity such that he defeats a motion to dismiss regarding retaliation by the City, but only as to his February 2020 suspension. *See Henderson v. FedEx Express*, 442 F. App'x 502, 507 (11th Cir. 2011) (stating that "events occur[ing] only two weeks apart . . . normally give[s] rise to an inference of causation"); *cf. Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 926 (11th Cir. 2018) ("[W]e have explained that an employee's termination within days—or at the most within two weeks—of his protected activity can

be circumstantial evidence of a causal connection between the two."). Consequently, Plaintiff has adequately pled a prima facie case of Title VII retaliation as to his February 2020 suspension and the City's Motion to Dismiss Count I is denied.

### 2. Count II: First Amendment retaliation (42 U.S.C. § 1983).

Any person who, under color of law, deprives any citizen of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured. *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021) (citing 42 U.S.C. § 1983). "The state may not discharge or demote a public employee in retaliation for speech protected by the First Amendment." *Id.* (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)).

A First Amendment retaliation claim "is governed by a four-stage analysis." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 617 (11th Cir. 2015). First, the Court must consider "whether Plaintiff's speech was made as a citizen and whether it implicated a matter of public concern." *Id.* (internal quotations and citations omitted). If the first threshold requirement is satisfied, the Court must then "weigh Plaintiff's First Amendment interests against the City's interest in regulating his speech to promote 'the efficiency of the public services it performs through its employees.'" *Id.* (internal quotations and citations omitted); *see also Gilroy*, 843 F. App'x at 196 (citing *Battle v. Bd. of Regents*, 468 F.3d 755, 759–60 (11th Cir. 2006)). The above two issues, which are questions of law to be decided by the Court, determine whether Plaintiff's speech is protected by the First Amendment. *Moss*, 782 F.3d at 618 (citing *Battle*, 468 F.3d at 760).

If the speech is protected, "the third stage of the analysis requires Plaintiff to show that it was a substantial motivating factor in his termination." *Id.* (citing *Battle*, 468 F.3d at

760). "If Plaintiff is able to make this showing, the burden shifts to the City to prove that it would have terminated Plaintiff even in the absence of his speech." *Id.* (citing *Battle*, 468 F.3d at 760). "Because these final two issues, which address the causal link between Plaintiff's speech and his termination, are questions of fact, a jury resolves them unless the evidence is undisputed." *Id.* (citing *Battle*, 468 F.3d at 760).

Finally, where a First Amendment Retaliation claim is brought pursuant to § 1983, Plaintiff has the additional burden of alleging § 1983 liability. The Court addresses each Defendant's argument in turn.

a. *The City.*

"An individual has a viable First Amendment claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1405 (S.D. Fla. 2014) (citing *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–284 (1977)). However, a municipality "cannot be held vicariously liable under § 1983 for constitutional violations committed by its officers." *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). A municipality is subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. A plaintiff must demonstrate: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

There are two methods by which a plaintiff generally may establish a city's policy: he must identify either (1) an officially promulgated policy or (2) an unofficial custom or practice shown through the repeated acts of a final policymaker. *Perez v. City of Opa-Locka*, 629 F. Supp. 3d 1164, 1175 (S.D. Fla. 2022) (quoting *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003)). Additionally, municipal liability may be imposed "for a single decision by municipal policymakers" where "action is directed by those who establish governmental policy." *Id.* (citation omitted); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("If the decision to adopt [a] particular course of action is properly made by [the] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood.").

In all cases, "a plaintiff (1) must show that the local governmental entity, here the [City], has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Grech*, 335 F.3d at 1329. Plaintiff does not allege an express City policy. Rather, Plaintiff alleges that the retaliatory acts were carried out by an ultimate policymaker. (DE 60 at 9.) Moreover, Plaintiff alleges that the City engaged in a pattern and practice of retaliation such that retaliation became an "adopted" policy of the Department. (*Id.* at 9–10.) The Court finds that Plaintiff has failed to allege liability against the City under either theory.

As to his first theory, Plaintiff alleges that, as a result of exercising his right to free speech, he was "relieved of duty, denied overtime, denied pay incentives, and ha[d] his work assignments, duty station and work hours changed." (DE 60 at 9.) Plaintiff states

that these acts were "carried out by ultimate **decision makers** Chief Colina, Chief Acevedo and Captain Ortiz," and that Ortiz' retaliatory acts were ratified by "the ultimate **decision makers** in the City of Miami Police Department." (*Id.* (emphasis added).) However, "[o]nly those . . . officers who have final **policymaking** authority may by their actions subject the government to § 1983 liability." *Kamensky v. Dean*, 148 F. App'x 878, 880 (11th Cir. 2005) (emphasis added) (quoting *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002)); *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003) ("The 'final policymaker' inquiry addresses who takes actions that may cause the municipality (here, [the City]) to be held liable for a custom or policy. The 'decisionmaker' inquiry addresses who has the power to make official decisions and, thus, be held individually liable."). Because Plaintiff alleges retaliation only by individuals he identifies as decisionmakers and not policymakers, Plaintiff cannot maintain a claim of municipal liability under this theory. *See Dipietro v. City of Hialeah*, 424 F. Supp. 3d 1286, 1298 (S.D. Fla. 2020) (dismissing § 1983 claim against City of Hialeah because plaintiff "does not plead either the chief of police or mayor is the final policymaker of the City concerning the act alleged to have caused the constitutional violation").

As to Plaintiff's second theory, Plaintiff alleges that the City had a policy of retaliating against "police officers who used their First Amendment Free speech rights to speak out against Ortiz and other racist policies of the Department." (DE 60 at 9–10.) In the SAC, Plaintiff lists multiple individuals who he claims were subject to the same treatment and demonstrate a widespread custom of retaliation by the City. (*Id.* at 10–11.) However, as the City maintains in its Motion to Dismiss, the examples "are completely devoid of any details." (DE 65 at 12–13.) Thus, Plaintiff's allegations in this regard are, at

most, "threadbare recitals" of First Amendment retaliation claims, "supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 663. For example, as to Leo Tapanes, Plaintiff states that he was "retaliated and subjected to disciplinary action by Captain Javier Ortiz for speaking up in union meetings regarding Javier Ortiz'[] corrupt behavior." (DE 60 at 10.) Likewise, Plaintiff states that "President Stanley Jean Poix and black officer Roman Carr were retaliated against for speaking up about the racism, corruption in the Department and pattern of Ortiz'[] behavior." (*Id.*) While the Court understands that the Rule 8 pleading standard does not require "detailed factual allegations," Plaintiff has presented nothing more than conclusory assertions of "racism" and "corruption," providing no specific facts as to the incidents at issue, the particular comments made and by whom, and why these matters are protected by the First Amendment. (*See, e.g.*, DE 74 (listing only the names of the officers and stating, "all of these officers were subjected to retaliation for using their First Amendment Rights to oppose illegal and improper practices by the City").) Consequently, the Court cannot deduce whether there is a custom or practice of First Amendment retaliation by the City. *See Fuerst v. Hous. Auth. of City of Atlanta, Ga.*, 38 F.4th 860, 875 (11th Cir. 2022) (citations omitted).

Some of Plaintiff's examples do not even describe First Amendment activity. For example, the allegations regarding Chief Anita Najiy state only that she was attacked publicly and harassed online by Captain Javier. (*Id.*) There is no suggestion that Chief Najiy engaged in protected speech—or any speech at all—to cause the alleged attack and harassment. (*See id.*) Because, as the City argues, Plaintiff fails to "delineate whether the individuals engaged in First Amendment activity, what the adverse employment actions were, whether they occurred because of the protected activity, and who

recommended or implemented the employment decisions" (DE 65 at 13), Plaintiff cannot demonstrate a custom or practice of First Amendment retaliation by the City. *Cf. Stepanovich v. City of Naples*, 728 F. App'x. 891, 898 (11th Cir. 2018) (affirming dismissal where complaint included only allegations that were "highly generalized, amounting to little more than a bald assertion[s]" of previous constitutional violations).

    b. *Ortiz.*

  "To state a claim under § 1983, a plaintiff must allege the deprivation of a constitutional or federal statutory right by someone acting under [color] of state law." *N.R. by Ragan v. Sch. Bd. of Okaloosa Cnty., Fla.*, 418 F. Supp. 3d 957, 977 (N.D. Fla. 2019) (citing *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1265 (11th Cir. 2010)). Only those with "the power to make official decisions" may "be held individually liable under § 1983." *Gilroy*, 843 F. App'x at 196 (quoting *Quinn*, 330 F.3d at 1326). In the employment termination context, a decisionmaker is someone who has the power to "immediately effectuate" termination, not merely to "recommend" it. *Quinn*, 330 F.3d at 1328. "An official or formal decisionmaker may, in the case of public employers, be identified 'by examining the statutory authority of the official alleged to have made the decision.'" *Gilroy*, 843 F. App'x at 196 (quoting *Quinn*, 330 F.3d at 1328).

  Plaintiff alleges that he "was relieved of duty, denied overtime, denied pay incentives, and ha[d] his work assignments, duty station and work hours changed by Captain Ortiz and the Department," and that this retaliation "was carried out by ultimate decision makers Chief Colina, Chief Acevedo and Captain Oritz." (DE 60 at 9.) Ortiz responds that these "conclusory allegations" are insufficient to withstand dismissal and,

alternatively, that he is entitled to qualified immunity.[7] (DE 66 at 6, 10–12.) Ortiz argues that Plaintiff's allegations fail to allege individual liability against him because Plaintiff does not allege that any adverse action taken against him was directly implemented by Ortiz or on his behalf or recommendation.[8] (*Id.* at 6–7.) The Court agrees.

Plaintiff's "naked assertions," which are "devoid of any factual enhancement" cannot support a cause of action against Ortiz. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Again, Plaintiff fails to provide any salient details about these allegedly retaliatory acts. For example, Plaintiff does not specify when each retaliatory action occurred, who engaged in each action, or what role Chief Colina, Chief Acevedo and Captain Oritz played in each event. Ultimately, Plaintiff has failed to plead that Ortiz had a "decisive role," or set forth any facts which would identify such a "decisive role," in the alleged retaliation, which is required to impose individual liability under § 1983. *See Edom v. Chronister*, 2021 WL 4244845, at *7 (M.D. Fla. Sept. 17, 2021) (dismissing First Amendment retaliation claim under § 1983 against sheriff in his individual capacity where plaintiff failed "to allege facts showing [defendant sheriff] had a decisive role in [plaintiff deputy sheriff's] termination"). Thus, Plaintiff has failed to establish a § 1983 claim against Ortiz.[9] Accordingly, Defendants' Motions to Dismiss Count II of the SAC are granted.

---

[7] Because Plaintiff does not adequately allege a § 1983 claim against Ortiz, the Court need not reach Ortiz' qualified immunity argument.

[8] In place of meaningfully responding to this argument with facts or case authority, Plaintiff's Response copies and pastes over fifty (50) paragraphs of the SAC. (*Compare* DE 74 at 17–24, *with* DE 60 at 6–11.)

[9] While the Court need not reach the merits of the underlying claim because Plaintiff has not articulated individual liability under § 1983, the Court notes that Plaintiff has also failed to allege that any of the adverse employment actions were in response to Plaintiff's

### 3.   Count III: intentional infliction of emotional distress.

Under Florida law, a claim for intentional infliction of emotional distress has four elements: (1) deliberate or reckless infliction of mental suffering, (2) outrageous conduct, (3) causation between the conduct and the emotional distress, and (4) severe emotional distress. *Lincoln v. Fla. Gas Transmission Co. LLC*, 608 F. App'x 721, 722 (11th Cir. 2015) (citing *Thomas v. Hosp. Bd. of Dirs. of Lee Cnty.*, 41 So. 3d 246, 256 (Fla. 2d DCA 2010)). To demonstrate whether infliction of emotional distress is deliberate or reckless, the plaintiff must show that the defendant's conduct was directed at the plaintiff. *See Baker v. Fitzgerald*, 573 So. 2d 873 (Fla. 3d DCA 1990). To demonstrate that the conduct was outrageous, the plaintiff must show that the defendant's actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985) (quoting Restatement

---

allegedly protected speech. Plaintiff alleges that he "was relieved of duty, denied overtime, denied pay incentives, and ha[d] his work assignments, duty station and work hours changed." However, as mentioned above, Plaintiff does not recount any pertinent details regarding these events (e.g., the timing of the events). Therefore, the Court cannot ascertain whether these acts occurred in response to Plaintiff's allegedly protected speech.

Assuming, *arguendo*, that Plaintiff's speaking out at the City Commission meeting on January 17, 2020 was protected speech, Plaintiff has plausibly alleged temporal proximity between that event and his suspension without pay in February 2020. (DE 60 at 4–5.) However, the allegations in the SAC suggest there was an independent IA investigation that resulted in Plaintiff's suspension (*see id.* at 12), undermining the notion that Ortiz was the ultimate decisionmaker behind the suspension, even if it was Ortiz who initiated the investigation. *See Edom*, 2021 WL 4244845, at *7 (determining that sheriff who initiated IA investigation that resulted in deputy sheriff's termination was not the decisionmaker regarding the termination because "initiating an investigation is not the same as making a final decision to terminate"); *Kamensky*, 148 F. App'x. at 878 (holding that official without decisionmaking power could not be held individually liable for recommending a retaliatory termination to a supervisor even if supervisor "rubber-stamped" defendant's recommendation of termination).

(Second) of Torts § 46 (1965)). In deciding whether conduct reaches this level, courts must make an objective determination; the subjective response of the person suffering emotional distress does not control. *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007). Moreover, whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law. *Id.*

Plaintiff asserts a claim of IIED against Ortiz because Ortiz "called him a 'coward' on multiple occasions to multiple third parties, publicly humiliated him in front of fellow officers and has continued to make his life in [the] [D]epartment a living hell." (DE 60 at 12.) Plaintiff provides specific examples to support his IIED claim. For example, Plaintiff was sent a screenshot through the "Telegram application . . . [w]here hundreds of City of Miami Police employees communicate work related matters," of a threatening message posted by Ortiz stating "I know who my enemies are . . . for the cancers in the PD, your day will come. There is a plan. You will see." (*Id.* at 13.) Additionally, Ortiz allegedly told a police supervisor who then confidentially told Plaintiff that Ortiz "would be back to work and that he was coming back with a vengeance. He named another supervisor as one of his intended targets." (*Id.*) Plaintiff claims the message "was designed to and had the effect of terrorizing Plaintiff Gomez and putting him under constant emotional duress by Ortiz." (*Id.*) Finally, Plaintiff states that his "personal and confidential" information was posted on the City of Miami Police forum on a public website (Leoaffairs.com), which was "orchestrated by Ortiz." (*Id.* at 13–14.)

These remarks and actions alone—however petty, disreputable, and unprofessional—do not sufficiently set forth a claim of IIED, as required by Florida law.[10] First, Plaintiff fails to allege that all of Ortiz' conduct was directed at him. *See Baker*, 573 So. 2d at 873 (affirming dismissal of IIED claim because appellant failed to demonstrate "outrageous conduct directed at appellant herself"). As to the Telegram message, Plaintiff does not say who sent him the screenshot or the context in which it was sent, and Plaintiff does not allege Ortiz' post mentions him by name or provide any facts to suggest that Ortiz directed the message at Plaintiff. Likewise, Plaintiff states that a police supervisor repeated a threat made by Ortiz. However, the threat was not made to Plaintiff, does not mention Plaintiff by name, and does not even reference Plaintiff's position (sergeant).

Even if Plaintiff could demonstrate that the messages were directed at him, Ortiz' conduct was not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *See McCarson*, 467 So. 2d at 278–79 (citation omitted). Not only are Florida courts generally "hesitant to find sufficiently outrageous conduct based solely on alleged acts of verbal abuse in the workplace," *Johnson v. Thigpen*, 788 So. 2d 410, 413 (Fla. 1st DCA 2001) (citing *Ponton v. Scarfone*, 468 So. 2d 1009 (Fla. 2nd DCA 1985)), but also "'[m]ere insults, indignities, threats, or false allegations' are not enough." *Cooper v. Empower U, Inc.*, 603 F. Supp. 3d 1317, 1322 (S.D. Fla. 2022) (quoting *Williams v. Worldwide Flight Servs., Inc.*, 877 So. 2d 869, 870 (Fla. 3d DCA

---

[10] Moreover, to the extent Plaintiff relies on the same statements underlying his defamation claim to support his IIED claim, the IIED claim fails. *See Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1278 (S.D. Fla. 2020) (quoting *Fridovich v. Fridovich*, 598 So. 2d 65, 70 (Fla. 1992) ("[A] plaintiff cannot transform a defamation action into a claim for intentional infliction of emotional distress simply by characterizing the alleged defamatory statements as 'outrageous.'")).

2004)); *Koutsouradis v. Delta Air Lines, Inc.*, 427 F.3d 1339, 1344–45 (11th Cir. 2005) ("Florida case law has consistently held that mere insults and indignities do not support a claim for the tort of intentional infliction of emotional distress."). "Indeed, Florida courts have rejected IIED claims based on allegations of conduct far worse than that alleged by [Plaintiff]." *Lopez v. Target Corp.*, 676 F.3d 1230, 1236 (11th Cir. 2012); *see also Lay v. Roux Lab'ys, Inc.*, 379 So. 2d 451, 452 (Fla. 1st DCA 1980) (affirming the lower court's dismissal of plaintiff's IIED claim where defendant threatened plaintiff with the loss of her job and began using "humiliating language, vicious verbal attacks, [and] racial epithets" because, while the court found the conduct to be "reprehensible," it did "not think that the alleged conduct reaches the level of outrageousness and atrociousness," required by Florida law). When evaluating Plaintiff's allegations against the standard articulated by Florida courts, Ortiz' actions do not rise to the level of being "atrocious, and utterly intolerable in a civilized community." *See Steadman*, 968 So. 2d at 595. Therefore, Plaintiff fails to state a claim of IIED under Florida law, and Ortiz' Motion to Dismiss as to Count III is granted.

### 4.    Count IV: defamation.

Under Florida law, a plaintiff seeking to state a defamation claim must plead the following elements: "(1) publication; (2) falsity; (3) actor must act with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) statement must be defamatory." *Briseus v. JPMorgan Chase Bank, N.A.*, 2018 WL 3586140, at *3 (S.D. Fla. July 26, 2018) (citing *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008)).

Plaintiff alleges that Ortiz said Plaintiff was a "documented coward" and "ran away from arrest." (DE 60 at 14.) Additionally, Ortiz stated that Plaintiff's wife left him for a "better man" and that Plaintiff has "domestic violence issues." (*Id.* at 15.) As alleged by Plaintiff, Ortiz explicitly stated he was acting in his private capacity and not acting as a police captain when he made the defamatory statements. (*Id.* at 14–15.) Plaintiff asserts that the statements were (1) published on television and online in a chat "available to thousands," (2) known by Ortiz to be false when he was making them, (3) defamatory to Plaintiff because the statements were designed to destroy his police career and subject him to hatred and ridicule, and (4) caused damage to Plaintiff's reputation and good name. (*Id.* at 14–15, 17.) Ortiz challenges only the characterization that the statements were false and defamatory.[11] (DE 66 at 18–20.)

"True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citations omitted). "Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court." *Id.* at 1262–

---

[11] Ortiz argues that he is entitled to absolute immunity as to the alleged defamation. (DE 66 at 16–18.) Regarding Plaintiff's allegation that Ortiz was making the statements in his individual capacity, Ortiz argues that Plaintiff's "characterization of Ortiz' actions is not determinative," and maintains that the dissemination of the statements was "within the ambit of [his] actions." (*Id.* at 17–18.) However, Ortiz provides no case law to suggest that the Court should ignore Plaintiff's allegation that Ortiz expressly stated he was acting in his individual capacity when he made the defamatory statements. Therefore, at the motion to dismiss stage, Plaintiff has adequately alleged that Ortiz was not acting within the scope of his duties when he made the defamatory statements and, therefore, is not entitled to absolute immunity. The Court further addresses Ortiz' claim of absolute immunity as to Plaintiff's defamation claim below. *Infra* section III(D)(1).

63 (citing *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985)). Court's must make this determination by construing the statements in their totality. *Id.*

Ortiz argues that the statements at issue are not defamatory.[12] (DE 66 at 18–20.) Specifically, he argues that calling Plaintiff a "coward" or that his wife left him for a "better man" are opinion statements and that stating Plaintiff "ran away from arrest" was rhetorical hyperbole. (*Id.*) Although the Court agrees that Ortiz' statements labeling Plaintiff a "coward" or that his wife left him for a "better man" are nonactionable insults, *see Mann v. Roosevelt Shop*, 41 So. 2d 894, 895 (Fla. 1949) ("Redress in the court does not extend to spoken words constituting a personal insult only."), the Court disagrees that Ortiz' statement that Plaintiff "ran away from arrest" is rhetorical hyperbole.

The decision in *Murray v. Pronto Installations, Inc.*, 2020 WL 6728812, at *1 (M.D. Fla. Nov. 16, 2020), the case which Ortiz relies upon to support his argument that his statement was hyperbole, is distinguishable. There, the Court held that the statements defendant posted about his boss on his personal Facebook page—immediately after his boss had fired him without notice because of his complaints about unpaid overtime—were not defamatory. *Id.* at *5. The Court reasoned that "a reasonable reader of [defendant's] Facebook post would have known that the statements therein were 'emotionally charged rhetoric' and the opinions of a frustrated employee who was immediately discharged after complaining about unpaid overtime." *Id.* at *6. This case is markedly different. The comment that Plaintiff "ran away from arrest" was not published on Ortiz' personal social

---

[12] Ortiz does not address his statement that Plaintiff had "domestic violence issues" in the context of Plaintiff's defamation claim and, therefore, that statement proceeds past the motion to dismiss stage.

media page to Ortiz' personal network of contacts but was shared publicly where the target audience consisted of other officers and governmental officials. Also, unlike *Murray*, the context here does not suggest (and Ortiz does not argue) that he was merely airing personal grievances and the statement was "emotionally charged." *See id.* Not only can this statement "reasonably be interpreted as stating actual facts" about Plaintiff, *see id.*, it actually was referring to a real incident that occurred in the line of duty where Plaintiff purportedly failed to ensure a subordinate officer made an arrest (*see* DE 60 at 12). Therefore, dismissal premised on Ortiz' conclusory characterization that his remark was rhetorical hyperbole is not appropriate, and Ortiz' Motion to Dismiss Count IV is denied.

### B. *Defendants' Motion to Strike Plaintiff's Declaration is denied.*

Defendants argue that Plaintiff's Declaration (DE 91-1) should be stricken because it directly "contradict[s] his deposition testimony regarding his alleged Title VII opposition" and is partly based on Plaintiff's "information and belief." (DE 94 at 5.) Defendants list various examples where they contend Plaintiff's Declaration is contradicted by other evidence in the record. (*Id.* at 5–9.) In response to the Motion to Strike, Plaintiff argues that his Declaration should not be stricken because his Declaration and his deposition testimony are consistent. (DE 100 at 5 ("[Plaintiff's] [D]eclaration is not inconsistent with his testimony, he just supplements it.").) The Court agrees.

"[A] party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). When this occurs, the Court may strike the affidavit as a sham. *Id.*; *Akins v. Fulton*

*Cnty., Ga.*, 278 F. App'x 964, 968 (11th Cir. 2008) ("Recognizing that parties may try to escape summary judgment by using affidavits to create issues of fact where none existed, we have allowed an affidavit to be disregarded as a 'sham' if it flatly contradicts earlier deposition testimony in a manner that cannot be explained." (citing *Van T. Junkins*, 736 F.2d at 657)). However, "[e]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (citations omitted). "A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Id.* at 953. The "sham affidavit rule" should be applied "sparingly because of the harsh effect this rule may have on a party's case." *Rollins*, 833 F.2d at 1530.

Here, the Court finds that Defendants have failed to satisfy their heavy burden. Defendants have not shown that Plaintiff's Declaration "flatly contradicts" Plaintiff's deposition testimony and the other evidence in this case. *See Akins*, 278 F. App'x at 968. While it is true that the disputed statements in the Declaration are not a verbatim recitation of Plaintiff's statements in his deposition, the Court finds that they are not inherently contradictory. Many of the disputed statements can stand without negating the truth of the other. For example, the FDLE report can be both an accurate representation of what Plaintiff told the FDLE but not recount the entirety of his communications with the FDLE. Likewise, Plaintiff could have met with Stephanie Panoff to report improper behavior and she could have ended that meeting immediately and advised him to reach out to the union

or an attorney.[13] Therefore, Defendants' Motion to Strike Plaintiff's Declaration is denied.[14]

### C. *The City's Motion for Summary Judgment is granted in part and denied in part as moot.*[15]

The City argues that it is entitled to summary judgment on Plaintiff's Title VII retaliation claim because Plaintiff has failed to establish a prima facie case of retaliation. (DE 86 at 3.) As with the City's Motion to Dismiss, the City argues that Plaintiff fails to establish that he engaged in an activity protected under Title VII or that there was a causal connection between the protected activity and the adverse employment action. The Court agrees that there is no genuine dispute of material fact that Plaintiff's appearance and testimony at the January 17, 2020 Commission Meeting was not the cause of Plaintiff's

---

[13] Defendants argue that at his deposition, Plaintiff did not give "clear answers" as to what happened in the meeting with Stephanie Panoff. Plaintiff admitted that he asked whether anyone was going to investigate the corruption but was hesitant to agree that he asked that question at the start of the meeting or that Ms. Panoff ended the meeting "immediately after." (*See* DE 86-2 at 221.) But Plaintiff's failure to give a "clear answer" regarding the events at the meeting may, arguably, buttress Plaintiff's position that his Declaration is merely supplementing his deposition testimony, not contradicting it. *See Rollins*, 833 F.2d at 1530.

[14] Notwithstanding the Court's denial of Defendants' Motion to Strike, the Court acknowledges that many of the statements in the Declaration amount to nothing more than hearsay, speculation, or opinion, which is impermissible under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Consequently, the Court will not consider any statements in the Declaration unless (1) it is clear from the Declaration that Plaintiff has personal knowledge of the specific facts or (2) the allegations are supported by other parts of the record.

[15] The City's Motion for Summary Judgment as to Plaintiff's First Amendment retaliation claim is denied as moot. *See supra* section III(A)(2)(a) (dismissing Plaintiff's First Amendment retaliation claim against the City).

suspension. Therefore, the City has shown that Plaintiff cannot prove an essential element of his claim.[16]

In familiar conclusory fashion, Plaintiff alleges that his February 2020 suspension occurred as a result of his testimony at the January 17, 2020 Commission meeting. (DE 60 at 5–6; *see* DE 91 at 13 ("Gomez has consistently testified and placed into the record evidence that the adverse action against him . . . all occurred shortly after he engaged in protected activity.").) On the City's Motion to Dismiss, the Court determined that Plaintiff plausibly alleged temporal proximity. *Supra* section III(A)(1)(b). However, upon review of the City's Motion for Summary Judgment, the exhibits submitted in support of the motion, and the record, the City has demonstrated that the February 2020 suspension related to a separate incident—unrelated to the January 2020 Commission Meeting—that occurred in February 2019. (*See* DE 86 at 7–8.)

On February 11, 2019, Plaintiff was involved in a matter with the Florida Fish and Wildlife Conservation Commission ("**FWC**"). (DE 86-15.) The FWC responded to a call regarding a dispute at the Brennan Channel, a waterway adjacent to Coconut Grove, and

---

[16] Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment (DE 91) does not contain anything to refute the City's argument that Plaintiff has failed to establish a prima facie case of Title VII retaliation. Similar to Plaintiff's Response in Opposition to Defendants' Motions to Dismiss, the Response in Opposition to Defendants' Motions for Summary Judgment simply copies and pastes the assertions from Plaintiff's Response Statement of Facts (*compare* DE 91, *with* DE 91-2), which primarily cites to Plaintiff's own Declaration (DE 91-1). However, neither the Response Statement of Facts nor the Declaration contain "specific, pinpoint references to particular parts of record material." *See* S.D. Fla. L.R. 56.1(b)(1)(B). And Plaintiff's own conclusory, circular, and self-serving statements are not "significantly probative." *See Anderson*, 477 U.S. at 249–50 (holding that evidence that is "merely colorable" or is not "significantly probative" will not prevent summary judgment).

brought the individuals involved to the Dinner Key Marina. (*Id.* at 1.) Plaintiff and Officer De Prado responded to the Dinner Key Marina in Miami, Florida, and after communication with the FWC and Lieutenant Cooper, Plaintiff was instructed to ensure that Officer De Prado arrested the individuals identified as the "primary aggressors" in the incident. (*Id.* at 2.) The day after Plaintiff "refused to comply with the order to ensure Officer De Prado made the arrest," (*id.*; DE 86-17), IA opened an investigation into the matter (DE 86-1 at 3). Then, on August 21, 2019, following the conclusion of the independent IA investigation (*see* DE 86-17), Plaintiff was issued a Reprimand (DE 86-15), which recommended that Plaintiff receive a 160-hour suspension (*id.* at 5).

After the Reprimand was issued, while Plaintiff's appeal to the Civil Service Board was still pending[17] (DE 86-1 at 4; DE 91-2 at 13), Plaintiff was sent a letter in connection with the Reprimand informing Plaintiff that he would "be suspended from work without pay for a total of one hundred and sixty (160) hours effective Feb[ruary] 24[,] 2020[.]" (DE 86-19.) In his deposition, Plaintiff admitted that the February 2020 suspension was related to the February 11, 2019 FWC incident. (DE 86-2 at 169 ("Q: And your suspension that we see in Exhibit 22 [DE 86-15 (the Reprimand)] was related to the investigation [into the FWC incident] that we see in Exhibit 20 [DE 86-17 (Inter-Office Memorandum by IA Investigator Sergeant Keler Gilet)]? A: Yes."); *cf. id.* at 126 ("Q: When you say, 'Suspension,' the only suspension that you have served, a recent date, is . . . February 24, 2020, for 160 hours? A: Yes.").) Consequently, and in the absence of any other facts contradicting Plaintiff's admission, there is no dispute that the February suspension was

---

[17] Plaintiff testified that he filed an appeal regarding this matter. (*See* DE 86-2 at 169–70.) As with other events and timelines, the record is unclear as to the timing of or status of this appeal. (*See id.*)

a response to the February 2019 fishing incident, not as retaliation for Plaintiff's speech at the January 2020 Commission meeting. Thus, Plaintiff failed to adequately establish causation between his protected conduct and the retaliatory action.

Nevertheless, Plaintiff maintains that the suspension was retaliatory because Ortiz was the one ordering Plaintiff to be relieved. (DE 91 at 13–14; DE 86-2 at 186.) However, this position is unsupported and contradicts the record evidence, specifically Plaintiff's own testimony. (*See* DE 86-2 at 126, 169.)  And even if Plaintiff were to prove that the suspension was recommended by Ortiz in retaliation for Plaintiff's speech at the Commission meeting, Plaintiff's retaliation claim still fails because there was an independent IA investigation into the matter (*see* DE 86-15; DE 86-32), and there is no evidence to suggest that the IA's decision was "tainted" by Ortiz' recommendation. *See Pennington*, 261 F.3d at 1270 ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."). Therefore, the City is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### D.  *Ortiz' Motion for Summary Judgment is denied.*[18]

Ortiz argues that he is entitled to judgment in his favor on Plaintiff's defamation claim because he is entitled to absolute immunity and, alternatively, the statements were not defamatory. (DE 89 at 16.) The Court disagrees and addresses each argument in turn.

---

[18] Ortiz' Motion for Summary Judgment as to Plaintiff's First Amendment retaliation and IIED claims is denied as moot. *See supra* section III(A)(2)(b), III(A)(3) (dismissing Plaintiff's First Amendment retaliation and IIED claims against Ortiz).

### 1.    Absolute immunity.

In Florida, "[p]ublic officials who make statements within the scope of their duties are absolutely immune from suit for defamation." *Stephens v. Geoghegan*, 702 So. 2d 517, 522 (Fla. 2d DCA 1997). "Conduct is within the scope of one's employment if it is the type of conduct which the employee is hired to perform, the conduct occurs substantially within the time and space limits authorized or required by the work to be performed, and the conduct is activated at least in part by a purpose to serve the employer." *Alfino v. Dep't of Health & Rehab. Servs.*, 676 So. 2d 447, 449 (Fla. 5th DCA 1996) (citing *Craft v. John Sirounis and Sons, Inc.*, 575 So. 2d 795 (Fla. 4th DCA 1991)). While the scope of an officer's duties should be construed liberally, *Cassell v. India*, 964 So. 2d 190, 194 (Fla. 4th DCA 2007), speech will not be considered within the scope of one's employment "if there was no official purpose" for the speech. *Densmore v. City of Boca Raton*, 368 So. 2d 945, 947 (Fla. 4th DCA 1979); *see Albritton v. Gandy*, 531 So. 2d 381 (Fla. 1st DCA 1988).

Ortiz argues that he is entitled to absolute immunity regarding the allegedly defamatory statements, and his primary argument in support of his claim is that he was "acting within the orbit of his duties as a City of Miami police officer." (DE 89 at 16–17.) The Court disagrees.

Ortiz' statement that Plaintiff "ran away from a fight"[19] was made at a MCPBA meeting and the statement that he has "domestic violence issues" was made in an

---

[19]  The evidence submitted in support of Ortiz' Motion for Summary Judgment demonstrates that he stated Plaintiff "ran away from a fight" not that he "ran away from arrest," as Plaintiff had originally alleged. (DE 87-5 at 8.) However, there is no dispute that this remark related to the FWC incident on February 12, 2019. (*See id.*)

MDPTAC chat on the Telegram application. (*Id.* at 17; DE 91 at 26.) To support his position that he made the allegedly defamatory statements in the "orbit" of his duties as a police officer, Ortiz argues that the statements discussed the internal functioning of and alleged misconduct within the Department and that he obtained the predicate information for the comments through his employment in the Department. Additionally, he states that in both instances he was speaking to City officials and/or fellow police officers. (DE 89 at 17.) However, Ortiz cites no case authority to support this interpretation of the law.

*Albritton*, a case Ortiz cites for the general rule of absolute immunity (*see id.*), fatally undermines his position. In *Albritton*, the court held that a county commissioner's statements to a county administrator resulting in a county employee's termination were not privileged because the county commissioner was not in charge of hiring and firing and, therefore, "there was no official purpose" for his statements. 531 So. 2d at 387 ("[The county commissioner] was not in charge of hiring or firing, and thus, there was no official purpose for [the county commissioner's] statements regarding [the county employee's] county employment.").

Similarly, here, there was no "official purpose" for Ortiz' statements. *See id.* For example, Ortiz' statement that Plaintiff "ran away from a fight" was made during the MCPBA hearing regarding racial disparities in the Department (*see* DE 88 at 7; DE 91-3 at 11), but there is no evidence to suggest that the statement in any way relates to that topic. And given that Plaintiff was not in Ortiz' chain of command at the time of any of the statements (DE 88 at 10; DE 91-3 at 16), Ortiz was not making the statements in a supervisory capacity. *Cf. Cassell*, 964 So. 2d at 196 (finding that police lieutenant's statements regarding his subordinate's claim of injury "were part and parcel of his duties

as [the subordinate officer's] supervisor and as a ranking officer accountable to other officers either in the chain of command or in positions of responsibility over potential claims for benefits").

Ortiz' argument focuses on the venue and audience rather than substance of his statements. Specifically, he claims he is entitled to immunity because his statements were made at an MCPBA Commission meeting (DE 88 at 7; DE 91-3 at 11), and on the Telegram app, which is used by the City's police officers (*see* DE 88 at 8; *see* DE 91-3 at 13). But, as demonstrated in *Albritton*, the venue and audience are not dispositive of this issue. In *Albritton*, it did not matter that the commissioner was speaking to a county administrator, only that the commissioner was speaking about personnel issues when he "was not in charge of hiring or firing." 531 So. 2d at 387. Thus, the fact that Ortiz' statements were made to other police officers at a police meeting and in police forums informs but does not dictate the Court's conclusion. The fact that Ortiz was speaking about another officer's personal and employment matters, which arguably had no relevance to Ortiz' employment at the Department, takes this situation outside the ambit of immunity. Accordingly, Ortiz is not entitled to absolute immunity for his statements that Plaintiff "ran away from a fight" and that he had "domestic violence issues."

### 2.   Defamation.

As to the defamation claim, Ortiz raises the same arguments he raised in his Motion to Dismiss (DE 66) and also argues that his comment about domestic violence is not defamatory because it is true. (DE 89 at 19–20.) The Court finds that there is a genuine dispute of material fact as to whether Ortiz' statements regarding Plaintiff "running away from arrest" and having "domestic violence issues" were defamatory.

As to the domestic violence statement, Ortiz argues that the statement is true because Plaintiff "petitioned for an injunction against Joseph Zalharalban . . . who was in a relationship with Plaintiff's ex-girlfriend . . . . That case concerned his purported domestic violence fears[.]" (DE 89 at 19; DE 88 at 3.) Ortiz attaches to his Affidavit a pdf of the alleged domestic violence case docket, which indicates that the case type is "Repeat Violence" and indicates that there was a "DV Hearing" on June 30, 2015. (DE 87-6); *see also Gomez v. Zahralban*, Case No. 2015-014678-FC-04 (Fla. 11th Cir. Ct. June 12, 2015).[20] However, Plaintiff contends that the case to which Ortiz was referring was not a domestic violence action, but a family court case in which Plaintiff sought a stay away order against Assistant Fire Chief Joseph Zaralbhan, who was in a relationship with Plaintiff's ex-girlfriend, and involved the wellbeing of Plaintiff's son. (DE 91-3 at 4.) While the Parties agree that Plaintiff initiated a lawsuit against Joseph Zaralbhan, who was in a relationship with Plaintiff's ex-girlfriend, there is a dispute as to whether it was a domestic violence lawsuit, which goes directly to the falsity element and defamatory nature of the statement. Because there is a dispute of material fact, judgment in Ortiz' favor is not warranted.

Next, the Court turns to the statement regarding Plaintiff running away from a fight. Ortiz argues that the statement was merely "rhetorical hyperbole" that is not "readily capable of being proven false." (DE 89 at 19–20.) Conversely, Plaintiff argues that Ortiz stated that Plaintiff ran away from a fight "as a factual matter." (DE 91 at 26.) Plaintiff contends that this statement stems from an incident where Plaintiff failed to make an

---

[20] "A court may take judicial notice of its own records and the records of inferior courts." *United States v. Glover*, 179 F.3d 1300, 1302 n.5 (11th Cir. 1999).

arrest and that Ortiz gave direct orders to have Plaintiff and another officer relieved of duty for this failure. (DE 88 at 3–5; *see also* DE 74 at 26.) While in certain contexts, the Court might agree that such a statement would be non-actionable opinion or hyperbole, in this case, the Court finds that the statement directly addresses a police officer's duties and, therefore, may be defamatory. *See Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1317 (S.D. Fla. 2020) (stating that whether a statement is defamatory "turns on the 'gist' of the alleged defamatory statement and the context in which that statement was made" (citation omitted)); *cf. Walsh v. Miami Herald Pub. Co.*, 80 So. 2d 669, 671 (Fla. 1955) (reversing appellate court's dismissal of defamation action by police officer where publication of libelous statement "tend[ed] to injure [plaintiff] in his trade"]). The dispute as to the false and defamatory nature of the statements precludes judgment in Ortiz' favor. Accordingly, Ortiz' Motion for Summary Judgment as to Count IV is denied.

## IV.    CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1.    The City's Motion to Dismiss (DE 65) is **GRANTED IN PART AND DENIED IN PART**.

2.    Ortiz' Motion to Dismiss (DE 66) is **GRANTED IN PART AND DENIED IN PART**.

3.    Defendants' Joint Motion to Strike Plaintiff's Declaration (DE 94) is **DENIED**.

4.    The City's Motion for Summary Judgment (DE 86) is **GRANTED IN PART AND DENIED IN PART**.

5.    Ortiz' Motion for Summary Judgment (DE 89) is **DENIED**.

6.    The Clerk of Court shall **TERMINATE** the City from this action and **RESTYLE** the case as *Gomez v. Ortiz*.

7.    Ortiz shall file his answer to the SAC within fourteen (14) days of the date of this Order.

**DONE AND ORDERED** in Chambers in Miami, Florida, this <u>29th</u> day of September, 2023.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE